NOT DESIGNATED FOR PUBLICATION

No. 122,943

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of M.F. and K.F.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed December 23, 2020. Affirmed.

*Dennis J. Stanchik*, of Olathe, for appellant natural father.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., BUSER and MALONE, JJ.

PER CURIAM: A father appeals the termination of his parental rights to his two children, M.F. and K.F. Because clear and convincing evidence supports the district court's findings that he was unfit and his unfitness was unlikely to change in the foreseeable future, we affirm.

In 2016, K.F. was found to be a child in need of care due to concerns over the parents' substance abuse. Father and Mother completed reintegration tasks and K.F. was reintegrated into the home in June 2017.

In November 2017, neighbors called police after seeing Father and Mother involved in a physical altercation with one another while holding one of their children.

1

Both parents were intoxicated. Two of Mother's older children (who are not involved in this case) told the Department for Children and Families that Father and Mother often engaged in verbal and physical altercations and were often impaired by alcohol. They did not feel safe when Father and Mother were drinking and fighting. And they said that Father and Mother did not take care of them when they were drinking.

In January 2018, the court ordered K.F. and M.F. to be taken into the temporary custody of the Secretary of DCF. At the time K.F. was three years old and M.F. was two months old. The parents entered no-contest statements and the court concluded K.F. and M.F. were children in need of care. Within a few weeks, Mother died.

In March 2018, the court approved a six-month reintegration plan. In order for the children to be returned to his custody, Father was required to:

- Maintain stable housing that was free of individuals with a criminal history or substance abuse problems;
- maintain employment;
- complete a family budget;
- participate in individual therapy and follow all recommendations;
- complete random drug and alcohol testing;
- complete a drug and alcohol evaluation and follow any treatment recommendations;
- follow visitation schedules;
- maintain transportation;
- comply with court orders and legal obligations; and
- have no new interactions with law enforcement.

2

Father has a long history of alcohol and drug abuse. He has used heroin, marijuana, OxyContin, Kratom, and compressed air. He has had many problems with the law. These include DUI convictions in 2001 and 2006, a 2011 theft conviction, and a 2016 conviction for child endangerment. He was in substance abuse treatment for significant periods of time.

The record discloses that K.F. had difficulty coping with the loss of her mother. She was anxious, had temper tantrums, and engaged in self-harming behavior. She started play therapy with a therapist at KVC. After her visits with Father, K.F. engaged in several concerning behaviors. These included:

- throwing herself on the floor;
- crying uncontrollably;
- acting defiant and disruptive;
- picking at scabs on her wrists and nose;
- making herself throw up;
- pulling her hair out; and
- biting herself.

She also drew a sketch showing Father with messy hair and an angry look on his face.

Beginning in June 2018, the situation degraded. Father appeared for visitations with an unkempt appearance, and smelled of body odor and urine. But his drug tests were clean. His appearance was "shocking." In July, he stopped visiting the girls regularly. He missed visits and once showed up late for a visit, stayed for five minutes, and then disappeared.

After that, Father began abusing inhalants—five to 10 cans per day. He huffed dusters and used Kratom because he understood these substances were not detectable on standard drug tests.

About the same time, Father was seen swerving into lanes of oncoming traffic and was charged with fleeing and eluding a police officer. The next day he was charged with DUI after being involved in a hit-and-run crash. He was convicted of both.

In July 2018, Father drove through a wooden fence while huffing vapors. This led to convictions for his fourth DUI and abusing toxic vapors.

Once again, in September 2018, after huffing, Father drove into a ditch and then crashed into a tree. He pled guilty to his fifth DUI, driving while suspended, and fleeing and eluding. Officers found eight aerosol cans in his vehicle.

In October 2018, the State filed a motion to terminate Father's parental rights to M.F. and K.F.

Father remained in custody from October 2018 to February 2019. He then received four weeks' inpatient treatment at Sunflower Wellness Center. Upon discharge, he began residing in a sober living facility.

K.F. was released from play therapy after the visits with Father stopped in September 2018. From December 2018 to March 2019, K.F. had no negative behaviors. In March 2019, Father resumed visitations with the children and K.F. resumed play therapy. When the therapist introduced a "Daddy" doll into the play, K.F. screamed and threw the doll in a corner. She did not want Father in her play. She became very anxious. She broke out into hives after therapy and had to be taken to the emergency room two

4

days in a row. M.F. was also "extremely anxious." The play therapist believed since Father had been absent for about a year, he would be seen as a stranger to M.F.

*Father's circumstances change.*

In May 2019, Father stipulated that he was unfit as a parent under K.S.A. 38-2269(b)(3) and (c)(3). Specifically, he stipulated that he had participated in drug and alcohol treatment several times in the past but had continued to use substances. He stipulated he was regularly using drugs from June 2018 until he was incarcerated in October 2018. He further stipulated:

> "The Court granted me a reintegration plan on March 12, 2018. The plan ended on September 12, 2018 and was never extended. I failed that reintegration plan. As of September 2018, I had to arrive at visits early to ensure I was not under the influence of drugs. I had not provided proof of being current on my mortgage since February 2018. I had not completed a budget as required. I had not worked since the end of May and was receiving some unemployment income. My driver's license was suspended and I had not provided proof of registration, licensing and insurance. Although I was submitting negative drug tests, I was using substances that were not detectable on those tests including compressed air and Kratom. I had not completed a drug and alcohol evaluation. I had been arrested seven times during my reintegration plan."

Because of a global plea agreement in his criminal cases, in June 2019, Father began probation. His probation required him to live in a sober living facility. Father also began a relationship with Brandy Loggins, whom he met at a sober living house. Loggins had signed away the rights to her own four children. The sober living house where he resided did not allow children to stay full-time with their parents.

By this time, in August 2019, the guardian ad litem filed a motion to terminate Father's parental rights.

Sometime in October 2019, Father opened a sober living house where men could live with their children. Several adult men lived at the house on a rotating basis. Father did not perform detailed background checks on the men. Father intended to share a single bedroom with his girls if they lived there.

Around that time, K.F.'s therapist showed her a picture of Father and K.F. responded, "I love my Daddy [ ], but I have a new family now."

The trial of the guardian ad litem's severance motion began in November 2019. At that time, Father did not have a valid driving license. Father testified he had been sober for 13 months. He was participating in AA meetings and individual therapy. The KVC case manager testified she had concerns about the UAs performed at the Oxford house because they were not random, they were performed by other residents in the house, and they did not test for Kratom or compressed air use. Father had completed a budget and had been working at Royal Metal Industries for about eight months. The budget did not allocate funding for childcare, food for the children, or rent for a suitable home for the children. Father provided names of people who could help transport his children.

Visitations were not occurring at the time of trial. The therapist could not recommend that K.F. see her Father.

Father repeatedly downplayed his relationship with Loggins, testifying that they had gone on a few dates but were just friends. He denied she was ever his girlfriend. Part of Father's relapse prevention plan was to not be in a romantic relationship with someone who used drugs or alcohol. That was a relapse trigger for him.

Father testified that he had changed; if he got his children back, this time would be different. He testified Mother dying in his arms had "rocked me to my core." But he now

realized that he could not use alcohol or drugs and he now had God in his life. But his case managers were concerned because he did not take responsibility for his actions.

He would repeatedly blame others for his situation. He blamed Mother for the children being removed from the home. He blamed Johnson County, the guardian ad litem, play therapy, and the lack of child-friendly, sober-living environments.

But he would not acknowledge that it was his decision to use substances or engage in illegal activities. He did not remember coming to visits disheveled or covered in urine. He did not remember huffing in the KVC parking lot, though he was seen doing so. He was not able to recognize the anxiety and trauma that K.F. experienced. Also, he was not straightforward about his relationship with Loggins.

Father's pastor and his employer testified in support of him. The pastor testified Father took on a leadership role within an addict group and was willing to do the hard work. The employer testified that Father was the kind of guy one wants to employ; he had a good work ethic, showed up to work, and was teachable. He had known Father for seven years and had seen Father interact with his children. He testified that Father showed him how to be a parent.

K.F. and M.F. had been in the same foster home since January 2018. When they first entered foster care, K.F. threw out-of-control fits. But the foster mother testified they had developed a bond and she was available to adopt the children.

After taking the matter under advisement, in January 2020, the court reopened evidence on a motion from the guardian ad litem. The State had filed a motion to revoke Father's probation. In December 2019, Father drove without a license with Loggins in the passenger seat. He was not supposed to be in contact with other probationers, such as Loggins. He referred to Loggins as his girlfriend.

After that, Father admitted Loggins was his girlfriend on October 23, 2019, but testified that they broke up before the trial on November 8, 2019 and got back together after the trial concluded. The trial concluded on November 22, 2019. Photos were introduced showing Father and Loggins together on November 27 and 29, 2019, and thereafter. In one they were wearing what appeared to be wedding rings. Father purchased his ring on November 20, 2019, from Amazon where it was listed for sale as a wedding ring. He claimed it was a sobriety ring.

Father was in jail awaiting disposition of his probation violation. At his probation revocation hearing, Father's probation officer was going to recommend that Father serve a jail sentence.

In April 2020, the court terminated Father's parental rights to K.F. and M.F.

On appeal, Father contends there was not clear and convincing evidence to support the district court's findings that he was unfit to parent under K.S.A. 2019 Supp. 38-2269(b)(7) and (b)(8). Father further contends there was not clear and convincing evidence to support the district court's finding that the conditions rendering him unfit to parent were unlikely to change in the foreseeable future. He does not dispute the court's finding that termination of his parental rights was in the children's best interests.

*We review the law concerning termination of parental rights.*

When a child has been adjudicated to be a child in need of care, the court may terminate parental rights when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2019 Supp. 38-2269(a).

8

When an appellate court reviews a district court's termination of parental rights, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the parent's right should be terminated. *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on any clear and convincing evidence standard, an appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The statute lists nonexclusive factors the court shall consider in deciding unfitness of a parent. K.S.A. 2019 Supp. 38-2269(b). The court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2019 Supp. 38-2269(c). Any one of the factors in K.S.A. 2019 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2019 Supp. 38-2269(f).

Upon making a finding of unfitness of the parent, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. K.S.A. 2019 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1).

*The evidence is clear and convincing that Father was unfit to parent.*

In severing Father's parental rights, the court made several legal conclusions. The court accepted Father's stipulation that he was unfit under the authority of two laws. In K.S.A. 2019 Supp. 38-2269(b)(3), the statute cites the use of intoxicating liquors, narcotics, or dangerous drugs of such duration or nature that renders the parent unable to care for the needs of the child. And, the court relied on K.S.A. 2019 Supp. 38-

2269(c)(3)—the failure to carry out a reasonable plan directed toward the integration of the child into the parental home. But the court also found that Father was unfit under K.S.A. 2019 Supp. 38-2269(b)(7)—finding that despite the reasonable efforts made by public and private agencies to rehabilitate the family, the family did not rehabilitate. The court then cited K.S.A. 2019 Supp. 38-2269(b)(8) and found that a lack of effort on the part of Father to adjust his circumstances, conduct, or conditions to meet the needs of the child supported the termination of Father's parental rights.

The court relied on several facts;
- This was K.F.'s second CINC case;
- Father did not have adequate housing for the children;
- Father was incarcerated as of the last day of the trial;
- K. F.'s behaviors were alarming; and
- Father would not acknowledge or take responsibility for his actions.

Father contends the record does not show that reasonable efforts of public and private agencies had failed to rehabilitate his family. He argues his relapse in 2018 was attributable to the loss of his wife, but he had maintained sobriety for thirteen months prior to the start of trial. He was attending AA meetings, church, work, grief counseling, and therapy. He argues that KVC had not made reasonable efforts to assist him in obtaining appropriate housing. He maintains that he went to "extraordinary efforts" to obtain housing for his children by establishing the new Oxford House. Father further contends that the record does not show that agency efforts in providing mental health services had failed to rehabilitate his family. He had been attending individual therapy since August 2019.

The statute requires reasonable, rather than effective, efforts to rehabilitate the family. *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). We question whether Father's idea of reasonable complies with the statute.

10

Father thinks that sharing a single room with his two young daughters in a sober living facility that houses six adult men with unknown criminal histories would be appropriate. This is despite the fact that KVC told him on several occasions it would not be appropriate. The district court found that it was "concerning for him to say on November 22, 2019 that he didn't know if this would be a viable option as it suggests that he was either not listening, not paying attention, or just resistant to hearing what he was being told to do."

KVC's attempts to steer Father away from the Oxford House as a viable option for housing his girls had not worked. The condition of suitable housing was spelled out in Father's initial six-month reintegration plan. Yet, as a direct result of Father's repeated criminal violations during the pendency of this case, he was required by the terms of his probation to reside in a sober living facility. And on the last day of trial, he was back in jail because he had violated his probation.

Father chooses to ignore the unsuccessful efforts made by the agency to provide mental health services to the girls. The district court found it concerning that Father could not process or understand that K.F. had anger and anxiety, he could not take responsibility for causing her anger and anxiety, and he instead focused on himself. The therapist for both girls could not recommend they have any contact with Father.

The record shows that the agency made reasonable efforts to reintegrate the family including providing substance abuse treatment, a case manager to assist with reintegration tasks, visitations with the children, and therapy. But Father was unfit to parent at the time of trial.

Father next contends that he had done all he could to adjust his circumstances "within the parameters of the constraints imposed upon him by the orders in his criminal cases."

11

Obviously, Father takes no responsibility for his criminal conduct that caused the criminal constraints to be imposed on him. He began taking steps forward after he was released from custody in February 2019, but he had taken too many steps backward during the first year after his children were removed. In May 2019, he stipulated he was unfit to parent. And that was still true six months later at the time of trial in November. He did not have suitable housing. He did not have a driving license. He did not complete a budget that was adequate to provide for his children. He was unable to visit his children. He was evasive and blamed others for his situation. And he was incarcerated as of the last day of trial for a probation violation.

*The evidence was clear and convincing that Father was not likely to change in the foreseeable future.*

Because children and adults perceive and experience time differently, courts must measure the foreseeable future in "child time" rather than "adult time." A parent's past conduct is indicative of future behavior. *In re M.S.*, 56 Kan. App. 2d at 1263-64.

Father contends that he made significant and positive steps toward changing his condition of unfitness because he:
- had remained sober for 13 months;
- relapsed because his wife died;
- was attending Bible study groups;
- had established a new Oxford House;
- had obtained full-time employment;
- was attending grief support groups and individual therapy;
- had submitted a budget;
- had provided a transportation plan;, and
- had participated in substance abuse treatment and developed a relapse prevention plan.

12

This is a case of some effort but little progress.

The court found that Father's conditions of unfitness were unlikely to change in the immediate or foreseeable future because he went from being on probation and house arrest with no adequate housing in place for his children on the first day of trial to being incarcerated on an alleged probation on the third day of trial. Father would not give a straight answer regarding the nature, extent, and duration of his relationship with Loggins. Father chose to be in a relationship with a person he acknowledged could be a relapse trigger for him.

Father's most recent substance of choice was undetectable by traditional urinalysis testing. It had been months since K.F. had seen Father and she could not see him until it was deemed therapeutically safe, which may not happen in the foreseeable future. Father did not understand that he had to take responsibility for his own actions. He consistently resisted answering questions during the trial. He was told repeatedly that he could not reintegrate with the children at the Oxford House. It was unknown when he would be able to obtain independent housing. When the trial began, K.F. was 61 months old and had been in custody for 28 of those months. M.F. had been in custody for 22 of her 25 months of age. The court found the children did not deserve to continue to wait for permanency.

Those court findings are supported by the record. There was clear and convincing evidence that Father's unfitness was unlikely to change in the foreseeable future. Father testified each day of trial. The district court was in the unique position to assess Father's credibility and the court did pass on Father's credibility. Father was evasive throughout the proceedings when asked basic questions concerning his prior child endangerment charge, his no-contest statement and stipulation to the conditions of his unfitness, his criminal charges during the pendency of this case, his use of inhalants in the KVC

parking lot, his appearance at visitations, and his relationship with Loggins. He would not admit to his bad behavior, but rather said things like it was "in the realm of possibilities."

When asked about his appearance at visitations, he blamed his case manager for not telling him it was problematic to come to visits with urine on his pants. When asked whether his appearance at visitations and his behaviors affected his children, he responded, "They're little. They were just happy to see their dad." He claimed he had not been told that a sober living facility was inappropriate for the girls. He did not know what was on his relapse prevention plan when asked about it. When he was arrested for violating his probation, he claimed he did not know he could not associate with Loggins. Father consistently deflected responsibility for his situation. And he was in jail as of the last day of trial.

The children have been out of Father's home since January 2018. Given their young ages, that is a considerable amount of time. Measuring in child time, there was ample clear and convincing evidence that Father's condition was unlikely to change in the foreseeable future.

The district court had no real alternative but to terminate Father's parental rights to K.F. and M.F.

Affirmed.